J-S75024-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RUBEN JAMES DUNKLE | : | |
| | : | |
| Appellant | : | No. 839 WDA 2019 |

Appeal from the Judgment of Sentence Entered April 24, 2019,
in the Court of Common Pleas of Clarion County,
Criminal Division at No(s): CP-16-CR-0000365-2018.

BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:              **FILED FEBRUARY 25, 2020**

Ruben James Dunkle appeals from the judgment of sentence imposed following his conviction of three counts of retail theft.[1]  Additionally, Dunkle's court-appointed counsel, Erich R. Spessard, Esquire, has filed a petition to withdraw as counsel and an accompanying brief pursuant to ***Anders v. California***, 386 U.S. 738, 744 (1967) (hereinafter the "***Anders*** Brief").  We grant counsel's petition, and affirm Dunkle's judgment of sentence.

The facts underlying the instant appeal are as follows.  On three consecutive days, October 4, 5, and 6 of 2017, Dunkle went to a Walmart store and selected expensive Lego products from the toy department.  He then

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] ***See*** 18 Pa.C.S.A. 3929(a)(4).

modified the bar codes on the products in a manner that caused them to reflect a different Lego product with a much lower price. On each occasion, he chose to use the self-checkout, where he could scan and pay for the items without assistance from a store clerk. Walmart later detected an unexplained reduction in inventory. It conducted an internal investigation which revealed the underpayments by Dunkle. Police then charged Dunkle with three counts of retail theft.

The matter proceeded to trial on March 29, 2019. The Commonwealth presented the testimony of Walmart Asset Protection Officer Corey Becker, who detailed his internal investigation following a report from the toy department that several expensive Lego products were missing. Becker introduced surveillance video footage from the three days in October of 2017. The video surveillance on each day showed Dunkle follow the same routine. He entered the store and went to the toy aisle. He left the toy aisle with various expensive Lego products in his cart, then scanned and paid for these items at the self-checkout.[2] Becker also introduced the receipts from those transactions, and explained that when Dunkle scanned the various expensive Lego items at self-checkout, they all rang up as an entirely different, and considerably less-expensive, Lego product namely, a Star Wars Lego Imperial

_____

[2] The parties stipulated that Dunkle is the individual depicted in the surveillance video footage. Additionally, Dunkle did not dispute the accuracy of the transaction receipts.

Trooper Battle Pack. *See* N.T. Trial, 3/29/19, at 39-64. Becker introduced a photograph of that particular item, which depicted a Lego product far smaller than the larger and more expensive Lego products Dunkle was seen purchasing in the videos. *Id*. at 43. The Star Wars Lego Imperial Trooper Battle Pack was valued at $11.97 (hereinafter the "$11.97 Lego kit").

On October 4, 2017, the video showed Dunkle purchase three items: a Star Wars BB-8 Lego Kit (retail price $95.00); a Star Wars Heavy Assault Walker Lego Kit (retail price $149.95); and a Millennial Falcon Lego Kit (retail price $119.00). *Id*. at 40-42, 51-53. This purchase should have totaled $363.96. *Id*. at 54. However, Becker introduced the transaction receipt which showed that Dunkle purchased three $11.97 Lego kits, and paid a total of $35.91 with his credit card. *Id*. at 44-46. The difference between the retail value of the items Dunkle actually purchased on October 4, 2017, and the price he paid was $328.05. *Id*. at 54.

On October 5, 2017, the video showed Dunkle purchase four items: two Millennial Falcon Lego Kits (retail price $119.00 each), and two Star Wars BB-8 Lego Kits (retail price $95.00 each). *Id*. at 56. This purchase should have totaled $428. *Id*. at 59. However, Becker introduced the transaction receipt which showed that Dunkle purchased four $11.97 Lego kits, and paid a total of $47.88 with his credit card. *Id*. at 55. The difference between the retail value of the items Dunkle actually purchased on October 5, 2017, and the price he paid was $380.12. *Id*. at 59.

Finally, on October 6, 2017, the video showed Dunkle purchase six items. *Id*. at 61-62. According to Becker, Dunkle paid the full retail price for the first three items. *Id*. at 61. The last three items that Dunkle purchased were two Star Wars Heavy Assault Walker Lego Kits (retail price $149.95 each), and one Millennial Falcon Lego Kit (retail price $119.00). *Id*. at 61-62. The retail value of these three items totaled $418.92. *Id*. at 63. However, Becker introduced the transaction receipt which showed that the last three items scanned were the $11.97 Lego kits. *Id*. at 62. Dunkle paid total of $35.91 for these three items. *Id*. at 63. The difference between the retail value of the last three items Dunkle actually purchased on October 6, 2017, and the price he paid was $383.01. *Id*.

Becker testified that, to his knowledge, there was no type of malfunction with the self-checkout system on any of the dates in question. *Id*. Nor was he aware of any problem with the bar codes placed on the more expensive Lego products by the manufacturer. *Id*. at 64. He indicated that the only way that the more expensive Lego items could have scanned as less expensive Lego items was by placing a small Lego box bar code on the large Lego boxes. *Id*.

Becker conceded on cross-examination that the surveillance videos did not specifically show Dunkle modifying the bar codes. *Id*. at 109. Nor did the video footage show any visible modifications to the bar codes on the scanned items. *Id*. at 112. However, Becker explained on redirect that no security

- 4 -

camera was directly aimed at the toy aisle, such that you "have to look over part of [another] aisle to see the Lego aisle." *Id*. at 188-19.

At the conclusion of trial, a jury convicted Dunkle of three counts of retail theft. On April 29, 2019, the trial court sentenced him to an aggregate term of thirty to ninety months in prison. Dunkle filed a timely post-sentence motion, which the trial court denied. Dunkle then filed a timely notice of appeal. Both Dunkle and the trial court complied with Pa.R.A.P. 1925. In this Court, Dunkle's counsel has filed petition to withdraw as counsel and an *Anders* brief. Dunkle did not file a response to either the petition or the *Anders* brief.

"When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Garang*, 9 A.3d 237, 240 (Pa. Super. 2010) (citation omitted). Pursuant to *Anders*, when counsel believes an appeal is frivolous and wishes to withdraw from representation, counsel must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record, counsel has determined the appeal would be frivolous; (2) file a brief referring to any issues that might arguably support the appeal, but which does not resemble a no-merit letter; and (3) furnish a copy of the brief to the defendant and advise him of his right to retain new counsel, proceed *pro se,* or raise any additional points he deems worthy of this Court's attention.

*Commonwealth v. Edwards*, 906 A.2d 1225, 1227 (Pa. Super. 2006) (citation omitted). In *Commonwealth v. Santiago*, 978 A.2d 349 (Pa.

- 5 -

2009), our Supreme Court addressed the second requirement of **Anders**, *i.e.*, the contents of an **Anders** brief, and required that the brief:

> (1)    provide a summary of the procedural history and facts, with citations to the record;
>
> (2)    refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3)    set forth counsel's conclusion that the appeal is frivolous; and
>
> (4)    state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361. Once counsel has satisfied the **Anders** requirements, it is then this Court's responsibility "to conduct a simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018).

Here, counsel has substantially complied with each of the requirements of **Anders**. Counsel indicates that he conscientiously examined the record and determined that an appeal would be frivolous. Further, the **Anders** brief substantially comports with the requirements set forth by the Supreme Court of Pennsylvania in **Santiago**. Finally, the record includes a copy of the letter that counsel sent to Dunkle, advising him of his right to proceed *pro se* or retain alternate counsel and file additional claims, and stating counsel's intention to seek permission to withdraw. Accordingly, counsel has complied

with the procedural requirements for withdrawing from representation, and we will conduct an independent review to determine whether Dunkle's appeal is wholly frivolous.

In the **Anders** Brief, counsel raises the following issue for our review: "Did sufficient evidence exist to prove the case beyond a reasonable doubt?" **Anders** Brief at 4.

Our standard of review of sufficiency claims is as follows:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

**Commonwealth v. Franklin**, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and quotation marks omitted). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, and the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence. **Commonwealth v. Jacoby**, 170 A.3d 1065, 1078 (Pa. 2017).

The crime of retail theft is established when the Commonwealth demonstrates that "[a] person . . . under-rings with the intention of depriving the merchant of the full retail value of the merchandise." 18 Pa.C.S.A. §

3929(a)(4). "Under-ring" is defined as "[t]o cause the cash register or other sales recording device to reflect less than the full retail value of the merchandise." *Id*. at § 3929(f). The "full retail value" is defined as "[t]he merchant's stated or advertised price of the merchandise." *Id*.

In discussing Dunkle's sufficiency challenge, counsel states that the claim has arguable merit because there was no direct video evidence showing him altering the bar codes, or showing that the bar codes on the merchandise he purchased had been modified. Counsel additionally points out that there was no evidence presented at trial regarding the accuracy or inaccuracy of the self-checkout scanners at the time Dunkle made his purchases. For these reasons. Dunkle asserts that the Commonwealth's evidence amounted to speculation or conjecture as to the elements of causation and intent to under-ring.

Nevertheless, counsel indicates his belief that Dunkle's insufficiency claim is frivolous because (1) video surveillance footage shows that the specific, more expensive Lego products were in Dunkle's possession; (2) receipts of the three sales transactions unequivocally show that the items Dunkle purchased were scanned as though they were entirely different, less expensive items; (3) Dunkle paid a price far less than the full retail value for each item; and (4) the inability to see Dunkle for a length of time on the video footage for each incident provided enough circumstantial evidence that he modified the bar codes while he was out of view of the security cameras.

Based on our review of the certified record,[3] we conclude that the evidence presented at trial, when viewed in the light most favorable to the Commonwealth, was sufficient to support the jury's finding that all elements of the offense of retail theft were proven beyond a reasonable doubt. The Commonwealth presented the testimony of Becker, who introduced the surveillance video footage that showed Dunkle purchasing expensive Lego products on three consecutive days. The Commonwealth also presented the receipts for those three transactions, which established that Dunkle paid for entirely different, and far less expensive products. In fact, the receipts show that all ten of the expensive Lego products that Dunkle purchased scanned as the exact same cheaper product (*i.e.*, the Star Wars Lego Imperial Trooper Battle Pack, valued at $11.97).

Although there was no direct video footage showing Dunkle modifying the bar codes, nor any video footage showing modified bar codes on the Lego items, the Commonwealth was not required to produce such evidence in order to secure a conviction. As noted above, the Commonwealth need not establish Dunkle's guilt to a mathematical certainty. **Franklin**, 69 A.3d at 722. Moreover, the facts and circumstances established by the Commonwealth

_____

[3] While the Commonwealth's Exhibit 6 (the DVD of the surveillance video footage) is included in the record, it is not viewable. While our inability to view the video footage is regrettable, it does not affect our disposition, as there is no dispute among the parties as to what the video footage shows and does not show, and the circumstantial evidence of Dunkle's guilt is overwhelming.

need not be absolutely incompatible with Dunkle's innocence. *Id*. Instead, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *See Jacoby*, 170 A.3d at 1078.

We conclude that the mass of circumstantial evidence produced by the Commonwealth, when considered collectively, was legally sufficient to prove beyond a reasonable doubt that Dunkle committed retail theft. Ample evidence was presented for the jury to find that Dunkle took the ten expensive Lego items and, when out of view of surveillance cameras, placed different bar codes on those items so that they would reflect a cheaper product when he scanned them himself. From this evidence, the jury could infer that Dunkle acted with the intention of under-ringing the items to deprive Walmart of their full retail value. Accordingly, we agree that Dunkle's sufficiency challenge is, in fact, wholly frivolous.

Finally, as required by *Anders*, we have independently reviewed the record in order to determine whether there are any non-frivolous issues present in this case. Our independent review of the record discloses no other non-frivolous issues that Dunkle could raise that his counsel overlooked. *Dempster*, *supra*. Having concluded that there are no meritorious issues, we grant Attorney Spessard's petition to withdraw as counsel, and affirm the judgment of sentence.

Petition to withdraw as counsel granted. Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/25/2020